**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL SKIDMORE,** | ) | **Case No.  4:11CV1760** |
| | ) | |
| **Petitioner,** | ) | **Judge Dan Aaron Polster** |
| | ) | |
| **v.** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **BENNIE KELLY, WARDEN,** | ) | |
| | ) | |
| **Respondent.** | ) | |

An Ohio jury convicted Michael Skidmore on eight counts of rape and gross sexual imposition for the sexual abuse he inflicted on his minor stepdaughter.  Now, having exhausted his state-court remedies, he petitions this Court for a writ of habeas corpus on the basis of certain conduct and remarks by the prosecutor during closing argument.  According to Skidmore, the remarks and conduct deprived him of his constitutional right to a fair trial.

Magistrate Judge Vernelis K. Armstrong has written a Report and Recommendation ("R&R") **(Doc. #15)**, in which he recommends denying the petition.  Skidmore has filed written objections to the R&R.  (**Doc. # 17**).  For the reasons that follow, the Court **ADOPTS** the R&R and **OVERRULES** Petitioner's objections.

## I.  BACKGROUND

When his stepdaughter (H.R.) was in the fifth or sixth grade, Petitioner began fondling her breasts and buttocks, and would walk into the bathroom while she was showering.  The abuse got worse.  At age twelve, H.R. fellated Petitioner; by her sixteenth birthday, this had happened over fifty times.  Petitioner would also perform oral sex on H.R., and, when H.R. was thirteen, Petitioner began inserting his fingers into her vagina and anus.  The abuse continued

with regularity until H.R. was fifteen.

On May 13, 2006, H.R. started dating a young man and so spent less time at home.  The abuse became less frequent, occurring about once a month after H.R. started dating her boyfriend, and altogether ended after two sex acts during the summer following H.R.'s freshman year of high school.  In December of 2006, H.R. confided in her boyfriend that Petitioner had abused her.  The young man encouraged H.R. to tell her mother, which she eventually did in April of 2007.  Her mother contacted Mahoning County Children Services Board ("MCCSB").

H.R. was interviewed by Renee Mayberry of the MCCSB.  H.R. discussed about the abuse.  Mayberry finished her investigation and turned H.R.'s file over to the Youngstown Police Department.  H.R. was then interviewed by Detective Tanner and Ellis from the Youngstown Police Department.

On November 29, 2007, the Mahoning County Grand Jury indicted Skidmore on twelve different counts:  one count of rape (Ohio Rev. Code § 2907.02) and one count of gross sexual imposition (Ohio Rev. Code § 2907.05) for each of the years between H.R.'s tenth and sixteenth birthdays.  Petitioner was acquitted of the rape and gross sexual imposition charges for allegations stemming from the acts occurring when H.R. was ten and eleven years old.  Petitioner was, however, convicted on all other counts—those that related to the acts that occurred when H.R. was twelve to fifteen years old.[1]

 On August 5, 2008, the court sentenced Petitioner to an aggregate prison term of thirty-one years to life, with post-release control for five years.[2]  Petitioner was also classified as a Tier

---

[1] Petitioner was convicted on counts 3, 4, 5, and 6 (rape), and counts 9, 10, 11 and 12 (gross sexual imposition).  Petitioner was found not guilty on counts 1 and 2 (rape), and counts 7 and 8 (gross sexual imposition).

[2] On count 3, ten years to life; count 4, seven years in prison; count 5, seven years in prison; count 6 seven years in prison; count 9, three years in prison; count 10, eighteen months in prison; count 11, eighteen months in prison; count 12, eighteen months in prison.   Counts 4, 5, and 6 were to be served consecutively to the sentence imposed in count 3.  The sentence in count 9 was to be

-2-

III Sexual Offender under Ohio Rev. Code § 2950.01.

Petitioner appealed his conviction to the Seventh District Court of Appeals and to the Ohio Supreme Court, but the appeals were denied.

Now before the Court is Petitioner's federal habeas petition, filed pursuant to 28 U.S.C. § 2254, which asserts one ground for relief.[3]  Magistrate Judge Armstrong recommends the Court deny the petition.  Petitioner timely filed Objections.  The Court has conducted a *de novo* determination of those portions of the R&R to which Skidmore properly objected.  *See* 28 U.S.C. § 636(b)(1)(C).

## II.  DISCUSSION

### A.  Ground One

Petitioner claims he was denied due process and a fair trial by multiple instances of prosecutorial misconduct, in violation of the Fifth and Fourteenth Amendments to the United States Constitution.   Under 28 U.S.C. § 2254, federal courts cannot grant a habeas petition for any claim that the State court adjudicated on the merits unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  "'In deciding whether prosecutorial misconduct mandates that habeas relief be granted, the Court must apply the harmless error standard.'"  *Macias v. Majowski*, 291 F.3d 447, 451 (6th Cir. 2002) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)).  The harmless error standard is an

---

served concurrently to the sentences imposed in counts 4, 5, and 6 and consecutively to the sentence imposed in count 3.  The sentences imposed in counts 10, 11, and 12 were to be served concurrently to each other and consecutively to the sentence imposed in count 9.

[3]Petitioner originally asserted four grounds for relief but has since withdrawn Grounds Two, Three, and Four.

inquiry into "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamsan*, 113 S.Ct. 1710, 1722 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Thus, to warrant habeas relief, the prosecutor's comments must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Macias*, 291 F.3d at 451 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  To constitute a denial of due process, the prosecutor's conduct must have rendered the entire trial fundamentally unfair. *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) (citing *Pritchett*, 117 F.3d at 964).    The Sixth Circuit has adopted a two-step test to evaluate claims of prosecutorial misconduct. *Macias*, 291 F.3d at 452.  First, the court will consider whether the prosecutor's conduct and remarks were improper.  *Id.*  If they were, then the court must apply the four-factor test set forth in *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994).  *Macias*, 291 F.3d at 452.  Those four factors include: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidently made; and (4) whether the evidence against the defendant was strong.  *Id.* (citing *Carroll*, 26 F.3d at 1385).   In applying these factors, the Court recognizes that, although the Sixth Circuit has adopted a uniform test for determining whether prosecutorial misconduct warrants habeas relief, "each case turns on its own unique facts." *Byrd*, 209 F.3d at 529 (quoting *Cook v. Bordenkircher*, 602 F.2d 117, 120 (6th Cir. 1979)).  Thus the Court must examine the statements within the context of the entire trial to determine whether they constituted prejudicial error. *Cristini v. McKee*, 526 F.3d 888, 899 (6th Cir. 2008) (citing *Girts v. Yanai*, 501 F.3d 743, 789 (6th Cir. 2007)).

Petitioner argues that the prosecutor engaged in misconduct by improperly vouching for the victim's veracity, personally vouching that Petitioner was a child molester, and publishing inadmissible evidence during closing argument.  Because, Petitioner argues, the prosecutor's improper conduct had a cumulative prejudicial effect in what was otherwise a "close case," the

Court should grant habeas relief.  The Court disagrees.

*1.  "Vouching"[4] for the victim's veracity by reference to consistent statements*

Petitioner argues the prosecutor acted improperly by saying to the jury during closing

arguments that the alleged victim had provided consistent statements:

> She told [her boyfriend].  She told her mother.  She told [MCCSB] two times.
> She told the police two times.  She told the prosecutor's office before she came in
> here.  She's always been consistent, always been consistent.  Because if she
> wasn't consistent, [defense counsel] would have been all over that, and he wasn't.

(Tr., Vol. III, p. 412).  Petitioner acknowledges that the victim testified that she had told her

boyfriend, mother, MCCSB, and the police that Petitioner had abused her.  Still, Petitioner

argues that the prosecutor provided no evidence that she provided *consistent* statements to each

party.

To the contrary, the prosecutor established that H.R. told multiple people that Petitioner

abused her.  This information came out during the victim's direct and cross examinations,

through the testimony of the victim's boyfriend and the MCCSB worker, and even defense

counsel's opening statement. H.R. testified on direct, after detailing the abuse, that she told her

boyfriend and mother "what was going on between [her] and [her] dad.." (Tr., Vol. II, pp. 255-

257.)  She also testified she was interviewed by the MCCSB and the police.  (Id., p. 258)

("[Prosecutor] Q: So you had to tell this story a couple times; right? [Victim] A: Yes.").

Further, the State did call two of the individuals the victim spoke to: her boyfriend and

Renee Mayberry, the MCCSB worker.  During the direct examination, the prosecutor asked

whether they knew of the victim being abused by Petitioner.  Both stated that they became aware

of the abuse after speaking to the victim.  (Tr., Vol. III, pp. 327-329, 347-348).  Mayberry

---

[4] The Court notes that although framed as "vouching," Petitioner is referring to conduct that more squarely fits into the definition of "bolstering."  Bolstering occurs when a prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not to the jury.  Vouching, on the other hand, occurs when the prosecutor places the prestige of the government behind the witness with the prosecutor's personal assurance of the witness's reliability. *See Walker v. Morrow*, No. 09-6537, 2012 WL 313689 at *15 (6th Cir. Feb.1, 2012) (citations omitted).  These terms are often used interchangeably. *See, e.g.*, *Cantrell v. Gray*, No. 84-3686, 1986 WL 16540 (6th Cir. Feb. 7, 1986).

corroborated the victim's testimony regarding the fact of penetration.  (*Id*. at 350-351).  Defense counsel did not dispute that the victim spoke to either of these witnesses, nor did defense counsel challenge the consistency of the story the victim told on the stand—counsel did not argue that she had told something different to either her boyfriend or Mayberry.  Instead, defense counsel focused on the victim's motive to lie about the abuse.

While the testimony elicited during trial did not confirm that the victim relayed the story to each of these people with word-for-word consistency, the prosecutor's statement implies that the victim never changed her story regarding the fact of abuse.  The prosecutor's statement was a reasonable inference from the evidence and does not imply that the victim's testimony was corroborated by evidence known to the prosecutor but not known to the jury.  As such, the prosecutor's statement was not improper.

But even if it was improper, the Sixth Circuit has recognized that improper vouching is rarely sufficient to be afforded habeas relief.  *See Byrd*, 209 F.3d at (citing *Toney v. Anderson*, No. 96-4284, 1998 WL 68919 (6th Cir. Feb. 13, 1998); *Martin v. Rivers*, No. 95-2210, 1997 WL 49067 (6th Cir. Feb. 3, 1997); *Boyle v. Brigano*, No. 93-3823, 1994 WL 242392 (6th Cir. June 2, 1994); *Cantrell v. Gray*, No. 84-3686, 1986 WL 16540 (6th Cir. Feb. 7, 1986); *Mitchell v. Ravitz*, No. 85-1029, 1985 WL 13742 (6th Cir. Sept. 30, 1985)).

Instead, a petitioner will be entitled to habeas relief only when "'the prosecutor's expression might reasonably lead the jury to believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was convinced of the accused's guilt.'"  *Cantrell v. Gray*, 1986 WL 16540 at *3 (Feb. 7, 1986) (Table) (quoting *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982)).  Where a prosecutor's comments during a closing argument are susceptible of two interpretations, one proper and one improper, "'the court should not strive to adopt one which casts doubt upon the prosecutor's intentions.'" *Id.* at *4.

And even if the statement was improper, the four-factor analysis supplied by *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994), does not entitle Petitioner to habeas relief.

The statement did not mislead the jury because there is a reasonable inference from the evidence produced at trial that the victim alleged abuse to multiple people on multiple occasions.  The fact that the jury convicted Petitioner on some of the counts and acquitted on others demonstrates that the jury carefully considered the evidence during their deliberations and were not swayed by any statements made by the prosecutor.  The comment was isolated, as it occurred only during closing statements, and it was not a deliberate misstatement of fact but was instead a response to both the evidence produced at trial and to Petitioner's theory of "liar, liar, pants on fire."

*2. Improperly vouching by injecting the prosecutor's personal opinion*

Petitioner also contends he is entitled to habeas relief because of another comment the prosecutor made during rebuttal.  The prosecutor said to the jury, "We didn't drag a citizen in here and charge him willy-nilly.  We dragged a child molester in here so you could find him guilty."  (Tr., Vol. III, p. 451).

To be sure, "[i]t is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of the witnesses or guilt of the defendant." *United States v. Krebs*, 788 F.2d 1166, 1176 (6th Cir. 1986) (quoting *United States v. Daniels*, 528 F.2d 705, 709 (6th Cir. 1976).  The prosecutor's statement, however, was not her personal opinion.

Though inartfully expressed, the prosecutor was arguing that the government decided to bring these charges, not on a whim, but because the evidence pointed to Petitioner's guilt.  The prosecutor's statement was made, moreover, in direct response to defense counsel's statement in closing argument: "A government takes a citizen off the street, drags them in and says he did it.  We know it."  (Tr., Vol. III, p. 436).   The prosecutor has the right to respond to defense counsel's strategy.

In any event, calling Petitioner a child molester does not rise to the level of a denial of due process.  *See Byrd*, 209 F.3d at 536 (prosecutor referring to petitioner as "Predator" several times throughout closing did not deprive him of a fair trial); *Olen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988) (prosecutor calling petitioner a "deadbeat," "thief," and "liar," even though

-7-

deliberate and extensive, no curative instruction was given, and evidence of guilt was not

overwhelming, was insufficient to rise to the level of a denial of due process).

### 3. *Publication of impermissible evidence*

During the victim's direct examination, the victim identified g-strings and a bikini the

Petitioner bought for her when she was thirteen years old.  (Tr., Vol. III, pp. 259-261).  Petitioner

did not object to this testimony.  It was not until the prosecutor moved for admission of the g-

string prior to closing argument that Petitioner objected; Petitioner argued that the proper

foundation had not been laid to identify the g-string as the specific one Petitioner purchased.

The judge sustained the objection and exclude the evidence, but not the victim's testimony about

it.  Nevertheless, the prosecutor then held up the g-string in front of the jury during closing and

said the following:

> Is that the kind of underwear that a loving father buys for his daughter willingly
> and then asks her to wear them?  It's the kind of underwear that a lover buys for
> you and asks you to wear them.  And Hayley says those are the ones that her dad
> bought, those are the ones when they went shopping together he helped pick them
> out.  Same with the bikinis, although not quite as revealing.  Her first bikini,
> string bikini (indicating).  And remember, these aren't underwear that were worn
> by a 17-year-old girl.  These are underwear that were worn by a 12- or 13-year-
> old girl.

(Tr., Vol. III, p. 416).

Improper admission of evidence does not warrant habeas relief when the information

conveyed was already before the jury through other admissible forms of testimony.  *Hill v.*

*Brigano*, 199 F.3d 833, 847 (6th Cir. 1999).  While the prosecutor should not have physically

shown the jury the exhibit during closing, the prosecutor was entitled to talk about it.  Because

the jury had already heard the testimony of the victim that Petitioner had purchased g-strings and

bikinis for her, it is unlikely that reference to the physical exhibit during closing misled, or,

unduly prejudiced, the jury.  The actions of the prosecutor, moreover, were isolated; the

prosecutor used the exhibit only during a small portion of her closing.  Though improper, the

conduct was not so prejudicial as to render the trial fundamentally unfair.

### B.  Cumulative Prejudicial Effect and a "Close Case"

Central to Petitioner's claim for relief is the notion that this was a "close case."  Having reviewed the transcript, the Court must disagree; this was not a close case at all.

Petitioner argues that the convictions on Counts Five, Six, Eleven, and Twelve were not supported by the evidence because the victim did not testify directly that sexual conduct occurred during the time periods those counts covered—when the victim was fourteen and fifteen years old.  Instead, the victim only testified that "this stuff" continued while she was fourteen and fifteen years old.  Petitioner relies upon *State v. Ferguson*, 5 Ohio St.3d 160, 167-68 (1983), which overturned a conviction where the only evidence supporting the rape conviction was testimony of the victim that she and the defendant had "intercourse."  However, the court in *Ferguson* focused on the fact that there was no evidence of penetration, which was an essential element of the crime.  In this case, there was ample testimony regarding the various sexual acts Petitioner committed.  The testimony was not as vague as Petitioner suggests:

> [Victim]: It progressed to him touching me even more. Like when my mom wasn't home or like she would be at work or my brothers could be home and my grandmother would be there but she would be watching my brothers, and he [Petitioner] would make me perform sexual acts for him.
> Q: What do you mean by that?
> A: He would make me suck his penis and give him a hand job.
> Q: Did he ever perform any other kind of sex acts with you?
> A: Yes.
> Q: What was that?
> A: He has put his fingers inside my vagina.
> A: And inside my anus.
>                     ....
> Q: Do you remember when that started?
> A: Around when I was 13.
> Q: And what about when he had you perform oral sex on him, when did that start?
> A: I think I was about 12.
> Q: Did he ever put his mouth anywhere else on you?
> A: Yes.
> Q: Where--what did he do?
> A: He has put his mouth on my breasts and my vagina.
> Q: Okay.  Did that happen any specific time or start happening at any specific time?
> A: No.
> Q: Okay.  How many times would you say he put his fingers inside your vagina?
> A: More than once.
> Q: Okay.  How many times did he put his fingers in your anus?
> A: I think about two.
> Q: Okay.  Do you remember that, that it was only two times?

A: Yes.  It's not a pleasant feeling.
Q: Okay.  What about him making you perform oral sex on him, how many times did that happen?
A: Too many to count.
Q: More than 50?
A: Probably.
Q: How long did all of this stuff keep happening for?  How long did it go on?
A: Up until I started dating my boyfriend...
Q: How old were you when you started dating [your boyfriend]?
A: 15.
Q: Did stuff just stop at that point?
A: It didn't exactly stop, but it had faded out because I was always gone.  I would go with [my boyfriend] places or just be out away from home.
....
Q: You said it kind of started not as much?
Q: Did it go down to once a month?
A: It was – when I started dating [my boyfriend], it was then my freshman year. So it was summertime.
A: So I think it happened – something may have happened twice like that summer and that was it.
....
Q: What happened the most?  What kind of sexual act happened the most?
A: Me giving him a blow job.
Q: And by blow job, do you mean your mouth on his penis?
A: Yes.
Q: And when you saw he performed oral sex on you, are you talking about his mouth on your vagina?
A: Yes.
Q: This all started when you were 10?
A: Yes.
Q: Kept going on when you were 11?
A: Yes.
Q: Kept going on when you were 12?
A: Yes.
Q: Kept going on when you were 13?
A: Yes.
Q: Kept going on when you were 14?
A: Yes.
Q: And when you were 15 up until you started dating [your boyfriend] and a couple times that summer.
A: Yes.

(Tr., Vol. II, pp. 247-253).  It is a stretch to call this a close case.

Additionally, even assuming that all of the incidents Petitioner alleges to be misconduct were in fact misconduct, they were not so prejudicial, individually or cumulatively, as to constitute a denial of due process.  Petitioner cites *Washington v. Hofbauer*, 228 F.3d 789 (6th Cir. 2000) and *United States v. Berger*, 295 U.S. 78 (1935), in support of his argument, but the

-10-

misconduct in both cases occurred throughout the entirety of the trial and involved instances of misconduct far in excess of those alleged by Petitioner. The instances of misconduct alleged by Petitioner happened three times throughout the course of the entire trial and all occurred during closing arguments, themselves brief, isolated episodes. Additionally, the prosecutor prefaced her closing statement with the caveat that what she said was not evidence; the judge instructed the jury the same. Taking these facts together, Petitioner was not denied due process by virtue of the cumulative effect of the prosecutor's supposed misconduct.

### III. CONCLUSION

Accordingly, the Court **OVERRULES** Petitioner's Objections (**Doc.** # 17), and **ADOPTS** Magistrate Armstrong's Report and Recommendation (**Doc. # 15**), and DENIES the underlying Petition for Writ of Habeas Corpus (**Doc. #1**).

**IT IS SO ORDERED.**

*/s/ Dan Aaron Polster   October 19, 2012*
**Dan Aaron Polster**
**United States District Judge**